## MULLIGAN v. WESTERN UNION TEL. CO.

## ZWIRNER v. SAME.

District Court, D. New Jersey, Oct. 5, 1937.

Carl H. Auerbach, of Camden, N. J., for plaintiff Andrew W. Mulligan.

Tenenbaum & Feinberg, of Camden, N. J., (Carl Kisselman, of Camden, N. J., of counsel), for plaintiff William F. Zwirner.

Edwards, Smith & Dawson, of Jersey City, N. J., (Francis R. Stark, of New York City, and Edwin F. Smith and Charles M. James, both of Jersey City, of counsel), for defendant.

FORMAN, District Judge.

In 1935 the country was swept by a fad or craze known as the "chain letter" scheme, the workings of which were something like the following although there were innumerable variations of the idea. X received a letter from Y in which Y stated that he had found a way to get rich quickly. He instructed X to place his name in the first position on the list of a number of names which he inclosed. X was further instructed to send a specified sum of money to the person whose name appeared last on the list. He was advised to write in like tenor to several of his friends, inclosing to each a copy of the list which contained his (X's) name in first place, omitting the last name, he having forwarded to that person the sum of money specified. X is advised that when his name reaches the bottom of the list money will begin to roll in upon him from all of the "links" in the chain which was started when his name was placed at the top of the list. He is then told that if he spurns this opportunity for untold wealth he should return the list to Y so that the chain might not be broken.

The American public responded to the idea with an enthusiasm characteristic of its desire for wealth, its generosity to help the next fellow to a similar state of well being, and its childlike trust that others would do unto it as it did to the others. The result was that the United States mails became burdened with hundreds of thousands of these letters and their inclosures daily until there dawned upon the myriad hosts of letter writers that Santa Claus was not genuine but only the central figure in a very pretty myth and that for most, great wealth is not acquired by the exertion of as little effort as is required to copy a form

of letter five times and to address it to five different persons.

Irate protests upon the part of the Postal · Department and prosecutions and threatened prosecutions for fraud also helped to cramp the style of the correspondents until in due time the fad faded into oblivion and the body of the citizenry shook itself out of another bad dream. [1]

Before this cessation, and while. the United States postal inspectors were rattling fraud orders and indictments at the mobs of letter writers, various other means of transmitting the letters were found. One of these means was by way of the Western Union Telegraph Company.

This practice so exercised two citizens of this state, Messrs. Andrew W. Mulligan, of Camden, and William F. Zwirner, of Merchantville, in Camden county, that they investigated the law upon the subject and they say they have ample remedy for the wrong committed by the said company. In June of 1935 each started a suit in the New Jersey Supreme Court against the Western Union Telegraph Company, in which he styled himself as a "common informer."

The complaint of Mr. Mulligan goes on to say. that the Western Union Telegraph Company aided and abetted in the transmittal of "chain telegrams," which amounted to lotteries. He described the method of operation in the sixth paragraph of his complaint in the following language:

"No. 6. The method of operation of the aforementioned lotteries was as follows: The person purchasing the ticket, hereinafter called the buyer, and the person selling the ticket, hereinafter called the seller, entered into the offices of the above named defendant and paid over to the agent of the aforesaid corporation, the sum of Two ($2.00) Dollars, and the company charges, together with a certain form heretofore made, conceived, typed, mimeographed, or different other mode of printing made by, with, and/or the direction, knowledge or consent or acquiescence of the defendant corporation or its agents, reading as follows:

" 'Send $2 to Western Union Stop Omit top name Stop Add yours Stop Sell two copies to good prospects only Stop Show receipt for money order Stop Bring customer to office to certify transaction.'

"In addition to the above, each form contained the names of six alleged individuals.

"The next step was to forward by Western Union, a money order of $2.00 to the name and address on the top of said list, after which said name was marked off and then the agent of the defendant corporation prepared two new forms containing substantially the same wording and including thereon the name of the buyer at the bottom of the list of persons attached to said forms and excluding the name of the person who had been at the top of said list. The buyer, in addition, receiving a receipt showing the payment of the sum of $2.00, plus the company charges. It then became the duty of the purchaser to follow the directions of the defendant corporation, to

---

[1] See the following item from magazine Time, vol. XXV, No. 19, issue of May 13, 1935, at 66:

"Chain Fever"

"About a month ago Denver postmen began to grumble at the loads they were lugging. Postal receipts at the Denver Post Office for April climbed dizzily and more than 100 extra hands were called in for full-time service to help handle the swelling volume of first-class mail. An amazing number of dimes began to pop out of the stamp-canceling machines. Finally it was discovered that a 'Send-a-Dime' chain letter was sweeping the city. Completely swamped, Postmaster James Orren Stevic called in postal inspectors to investigate the possibilities of stopping the scheme as fraudulent. 'The thing is staggering in its proportions,' sighed weary Postmaster Stevic. When the Post Office Department in Washington pronounced the letters illegal, Denverites protested so loudly that Postmaster Stevic had to have his home telephone disconnected.

"'Headed 'Prosperity Club—In God We Trust,' the chain letter contains six names. A recipient is supposed to mail a dime to the first name on the list, and that name is then scratched off. At the bottom of the list is added the name of the recipient, who then mails out five copies to gain new 'Prosperity Club' members. He does not receive any dimes until after his letters have multiplied six times and his name has moved to the top of the list. Then if the chain is unbroken, he will receive no less than 15,625 dimes ($1,562.50). Chain letters fall afoul of the Postal regulations because if the chain is broken the participants are guilty of making promises they cannot keep. And there is nothing to prevent a sharper from making a handsome profit by mailing out 10,000 letters with his name at the top of each list. * * * "

sell the two copies then in his possession, to two additional purchasers whom he would bring into the offices of the defendant corporation and who would pay over to the agents of the defendant corporation the sum of $2.00 individually, together with the company charges, which sum or sums would be forwarded to the person whose name appeared at the top of the list and who in return would receive a receipt acknowledging the receipt of the sum of $2.-00, together with a new form containing thereon the name of the then purchaser at the bottom of the list, and eliminating the name of the person upon the top of the list, and etc."

He says that in so doing the Western Union Telegraph Company violated the several following provisions of the Constitution and laws of the state of New Jersey:

Article 4, § 7, par. 2, of the Constitution of New Jersey as amended in 1897:

"No lottery shall be authorized by the legislature or otherwise in this state, and no ticket in any lottery shall be bought or sold within this state, nor shall pool-selling, book-making or gambling of any kind be authorized or allowed within this state, nor shall any gambling device, practice or game of chance now prohibited by law be legalized, or the remedy, penalty or punishment now provided therefor be in any way diminished."

"An Act for the punishment of crimes," N.J.P.L.1898, p. 809, 2 N.J.Comp.St.1910, pp. 1743, 1764, § 57:

"Any person who shall give, barter, sell or otherwise dispose of, or offer to give, barter, sell or otherwise dispose of, any ticket or tickets or any share or interest in any ticket or tickets in any lottery, whether erected, set up, opened or made in this state or elsewhere, or the chance or chances of any such ticket or tickets; or who shall issue any policy of insurance, or insure or receive any consideration for insuring for or against the drawing of any ticket or tickets, number or numbers, or any share or interest in any ticket or tickets, in any lottery, or shall receive any money, goods or thing in action, in consideration of any agreement to repay any sum or sums of money, or to deliver any goods or thing in action, if any ticket or tickets, or any share of any ticket or tickets, in any lottery, shall prove fortunate or unfortunate, or shall be drawn or not drawn on any particular day, or in any particular order, or shall promise or agree to pay any sum of money, or deliver any goods or thing in action, or to do or forbear to do anything for the benefit of any other person or persons, upon any event or contingency dependent on the drawing of any ticket or tickets, or any share of any ticket or tickets, or upon the drawing of any number or numbers in any lottery, shall be guilty of a misdemeanor."

"An Act for the punishment of crimes," N.J.P.L.1898, p. 812, 2 N.J.Comp.St.1910, pp. 1743, 1766, § 65:

"Any person or corporation that shall habitually or otherwise, buy or sell what is commonly known as a pool, or any interest or share in any such pool, or shall make or take what is commonly known as a book, upon the running, pacing or trotting, either within or without this state, of any horse, mare or gelding, or shall conduct the practices commonly known as book-making and pool selling, or either of them, or shall keep a place to which persons may resort for engaging in such practices, or either of them, or for betting upon the event of any horse race, or other race or contest, either within or without this state, or for gambling in any form, or aiding, abetting or assisting therein, shall be guilty of a misdemeanor, and punished by a fine of not less than one thousand dollars, nor more than five thousand dollars, and by imprisonment in the state prison for not less than one year nor more than five years; and any corporation of this state convicted of offending against this section, shall be dissolved thereby, and its corporate franchises shall thereby become forfeited and void, without any other proceedings to that end."

"An Act to prevent gaming," N.J.P.L. 1871, p. 109; 2 N.J.Comp.St.1910, p. 2623 and p. 2625, § 8:

"No person shall, within this state, publicly or privately, erect, set up, open, make or draw any lottery prohibited by the laws of this state; and any person who shall offend in the premises shall forfeit, for every such offense, two thousand dollars, to be recovered by action of debt, with costs, by any person who will sue for the same, in any court of record having cognizance thereof; and all penalties recovered under this section shall be appropriated one-half thereof to the use of the county in which the action or actions for the recovery thereof shall have been prosecuted, and the residue to the informer;

and in every action instituted under this section, the inhabitants of the county where the same is instituted shall be competent to serve as jurors, and admitted as witnesses in any such action, notwithstanding their liability to taxation, or being interested."

Mr. Mulligan alleges that there are two additional pertinent provisions of the New Jersey Laws, sections 58 and 59 of the Crimes Act, 2 N.J.Comp.St.1910, pp. 1764 and 1765, §§ 58, 59, as follows:

"Any person who shall advertise, either directly or by indirect, covert or suggestive language, any lottery company, or the place and manner at or in which the tickets, slips or advertisements of any lottery company can or may be procured, or shall bring into this state, or print or distribute herein any such advertisements, or who shall knowingly be engaged as a messenger, clerk or copyist, or in any other capacity in or about any office or room in any building or place where lottery slips or copies of numbers or lists or drawings of any lottery drawn, or alleged to be drawn, anywhere within or without this state shall be printed, kept or used in connection with the business of lottery or lottery-policy, so called, or any person who shall knowingly have in his or her possession any paper, document, slip or memorandum that shall pertain in any way to the business of lottery-policy, so called, or any owner or owners of any building or place where any business of lottery or lottery-policy, so called, shall be carried on, who shall knowingly by himself, or his agent, permit such premises to be so used, shall be guilty of a high misdemeanor."

"Any express, telephone, telegraph, or other company or corporation, engaged in the business of carrying or transmitting packages, letters, or communications within this state, or any person engaged in such business, that shall knowingly bring or transmit by letter or communication of any kind, telephonic, telegraphic, or in any other way, whether written or expressed by letters, numbers, characters or cipher, the drawing or list of numbers drawn or purporting to be drawn of any lottery or drawing, to any place within this state; or that shall knowingly receive from any person by letter, telephone or telegraph, such list of numbers or drawing of any such lottery; or that shall knowingly carry any message or messages that shall further or promote the interest of any unlawful pursuit, or in any way enable any person to carry on any business or practice declared illegal by the

statutes of this state, shall be guilty of a high misdemeanor."

Mr. Mulligan says that these infractions of the New Jersey Laws occurred on twelve days in June, 1935, in the offices of the Western Union Telegraph Company in 325 places in New Jersey, ranging alphabetically from Absecon to Yardville, each situate in one of the 21 counties constituting New Jersey. In all there were, according to Mr. Mulligan's count, 13,505 violations, for which the Western Union should pay the sum of $2,000 each, or an aggregate of $27,010,000 of which $13,505,000 should be divided among the 21 counties in the proportions as set forth in Mr. Mulligan's complaint and the balance of $13,505,000 is claimed by Mr. Mulligan for his personal share of damage.

Mr. Zwirner's declaration is of the same nature except that he modestly confined his complaint to the activities of the Western Union Telegraph Company at 8 Broadway in the city of Camden where he says the company violated the same laws some 200 times on 9 days in June, 1935. This makes 1,800 offenses against the law for which he is satisfied to collect but $3,600,000, half of which it is assumed he will be glad to remit for the benefit of Camden county.

The defendant, Western Union Telegraph Company, removed these cases into the United States District Court and the plaintiffs seek to remand the causes to the state tribunal.

The issue raised in this particular proceeding then is not concerned with the merits of the complaint. We are not to inquire now into the charges of these two plaintiffs, who have filed claims for such fantastic sums that the wildest imaginings of the most ardent of chain letter writers pale into a light gray insignificance by contrast. We have to decide only whether the defendant is entitled to hold the cases in this court or whether they should be returned to the court from whence they came.

This turns the inquiry away from the burlesque features of these complaints to the sober consideration of whether the appropriate court of the state of New Jersey may be deprived of jurisdiction over actions of the nature of these at the will of a defendant who chooses to exercise an alleged power to remove them to a federal court. At once we are precipitated into a grave and important query transcending by

far in importance any other questions which may have been raised by the institution of these suits.

The right of removal springs from the following provision of the Judicial Code of the United States found in title 28 U.S.C. A. § 71: "Any suit of a civil nature, at law or in equity, arising under the Constitution or laws of the United States, or treaties made, or which shall be made, under their authority, of which the district courts of the United States are given original jurisdiction, in any State court, may be removed by the defendant or defendants therein to the district court of the United States for the proper district. Any other suit of a civil nature, at law or in equity, of which the district courts of the United States are given jurisdiction, in any State court, may be removed into the district court of the United States for the proper district by the defendant or defendants therein, being nonresidents of that State."

Title 28 U.S.C.A. § 41(1) provides the following:

"The district courts shall have original jurisdiction as follows:

"(1) *United States as plaintiff; civil suits at common law or in equity.* * * * or, where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000, * * * or (b) is between citizens of different States."

Plaintiffs in their motion to remand contend that the suits are not *civil actions* but are based upon penal statutes of a criminal nature. They challenge the jurisdiction of the federal courts to remove such actions and submit that the power of enforcement of such a statute is exclusively within the jurisdiction of the sovereign state.

The defendant insists that the actions are civil in nature as contradistinguished from proceedings criminal in nature and that they are suits "not involving criminal prosecutions and punishments."

The law of New Jersey relating to lotteries is embodied in the prohibition against them contained in the Constitution; the Crimes Act and the Gaming Act. Excerpts from these are contained in the pleadings and have been recited herein.

It is the contention of the defendant that the Gaming Act under which plaintiffs in these suits seek to recover these penalties is a law which authorizes a civil proceeding in form and substance. They say that such an action is within the purview of the Federal Removal Statute because it is not criminal in nature and is not a suit "involving criminal prosecutions and punishments."

The defendants cite a number of cases involving penalties and quitam actions in the New Jersey and other courts, wherein such actions are held to be civil proceedings, but in these cases the issue usually revolves on the point as to whether the particular defendant shall be regarded as a criminal defendant entitled to the safeguards provided by the law for such a status. So in the case of Brophy v. Perth Amboy, 44 N.J.Law, 217, Brophy violated a city ordinance which provided that no person should operate a beer saloon without a license under a penalty of $50, half of which would go to the informer. Under this ordinance he was convicted and sentenced to pay the fine and costs. An execution was issued against his goods and no goods being found he was taken into custody. He gave bond under the act providing for the relief of persons imprisoned on civil process. On application to the court of common pleas he was discharged under that act. The city of Perth Amboy brought a certiorari to test the validity of the order of discharge, and on it the Supreme Court set aside the order on the ground that the process on which he was imprisoned was not a civil process. The New Jersey Court of Errors and Appeals held that the city's charter gave the power of enforcing the ordinances by penalties of two sorts, fine and imprisonment. The city had enacted that the penalty should be a fine only. The court approved the theory that the recovery of the penalty or fine under such circumstances, although a quitam action, was nevertheless a civil proceeding and not criminal, and the rules of procedure in civil cases are applicable. The finding of the New Jersey Supreme Court was reversed.

Numerous decisions are cited by the defendant to show that suits both in the New Jersey courts and the federal courts for the recovery of penalties and forfeitures are triable as civil suits, and the defendants in such suits are given the benefit of statutes relieving poor civil debtors and the like benefits because in such actions the defendants are not regarded as criminal defendants.

But I am not persuaded that these holdings control this court when it is con-

fronted with the necessity of deciding whether this action is of such a civil nature as to permit removal under the federal law.

The Gaming Act (supra) provides that any person who shall set up a lottery prohibited by the laws of the state shall be liable to the penalty. It is necessary to go to the Crimes Act to discover what lotteries are prohibited by the laws of the state. Here we find them declared to be misdemeanors. Cf. Wolcott v. Skahill, 56 N.J.Law, 221, 27 A. 912.

It is inescapable that in their strictest sense these suits are for penalties. They are not actions for private injuries, but solely for offenses committed against the state of New Jersey and its laws. The form of these actions is civil, and the proceedings leading to judgment against the defendant must be civil. Execution of the judgment, if there should be any, must be in accordance with the civil practice. However, the only issue before me is whether or not the actions are civil as contemplated in the light of the removal statutes.

This seems to have been settled by the language of the Supreme Court in the case of State of Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 299 et seq., 8 S.Ct. 1370, 1378, 32 L.Ed. 239, wherein the court said,

"The statute of Wisconsin, under which the state recovered in one of her own courts the judgment now and here sued on, was, in the strictest sense a penal statute, imposing a penalty upon any insurance company of another state doing business in the state of Wisconsin without having deposited with the proper officer of the state a full statement of its property and business during the previous year. Wisconsin Rev.Stat. § 1920. The cause of action was not any private injury, but solely the offense committed against the state by violating her law. The prosecution was in the name of the state, and the whole penalty, when recovered, would accrue to the state, and be paid, one-half into her treasury, and the other half to her insurance commissioner, who pays all expenses of prosecuting for and collecting such forfeitures. Wisconsin Stat.1885, c. 395. The real nature of the case is not affected by the forms provided by the law of the state for the punishment of the offense. It is immaterial whether, by the law of Wisconsin, the prosecution must be by indictment or by action; or whether, under that law,

a judgement there obtained for the penalty might be enforced by execution, by scire facias, or by a new suit. In whatever form the state pursues her right to punish the offense against her sovereignty, every step of the proceeding tends to one end,— the compelling the offender to pay a pecuniary fine by way of punishment for the offense.

"This court, therefore, cannot entertain an original action to compel the defendant to pay to the state of Wisconsin a sum of money in satisfaction of the judgement for that fine."

No better critique of this decision in its application to the question at bar can be given by this court than to cite the opinion of Judge Brewer in the case of State of Iowa v. Chicago, B. & Q. R. Co. (C.C.) 37 F. 497, 502, et seq., 3 L.R.A. 554, as follows:

"And now it becomes necessary to notice the last utterance of the supreme court, in the case of State of Wisconsin v. Insurance Co., 127 U.S. 265, 8 S.Ct. 1370 [32 L. Ed. 239]. That case was this: The state of Wisconsin brought an action in one of her own courts against the defendant, to recover a penalty prescribed by the statutes for a transaction of insurance business in the state without a license. The action was a civil action in form, to-wit, an action of debt. The statutes provided that one-half the penalty should go to the state, and one-half to the insurance department, to cover expenses, etc. Judgement was recovered in that action for the amount of the penalty. The defendant was a citizen of the state of Louisiana. Thereupon the state of Wisconsin brought an original action in the supreme court of the United States against the defendant, a citizen of another state, on that judgement. It will be seen that that action is somewhat removed from this in that, not being an original action to recover a penalty, it was to recover on a judgement in a civil action for a penalty. By the constitution of the United States the supreme court has original jurisdiction of controversies between a state and a citizen of another state. Yet notwithstanding this general jurisdiction of the supreme court, it held that it had no jurisdiction of this action. Several lines of argument were followed by the court in reaching its conclusion. It held that that grant of jurisdiction was of judicial power, and was not intended to confer upon the courts of the United States jurisdiction of

a suit or prosecution by the one state of such a nature that it could not, on the settled principle of public and international law, to be entertained by the judiciary of another state at all; that the enforcement of the criminal laws of a state was by such principles limited exclusively to the courts of the state whose laws were charged to have been violated; and that the form of the action prescribed was immaterial,— courts looking ever to the substance, nature, and purpose of the action; and that in the case at bar, although the form of the action was civil, being an action of debt, to recover on a judgement in an action of debt for a penalty, it was in substance of a criminal nature, and an effort upon the part of the state to enforce its criminal laws. * * *

"Though this case is not precisely in point, yet the thought underlying it, the principle which controlled the decision, is applicable here; and it must be adjudged that in the opinion of the supreme court of the United States—the ultimate authority on questions of this kind—an action to enforce a penalty, whatever may be its form, is one of a criminal nature. As such, within the removal act, it is not a removable case. My conclusion therefore is that this action is not one that can be removed to the federal courts, and the motion to remand must be sustained."

So, too, the question in our cases may not exactly parallel the question decided in State of Wisconsin v. Pelican Ins. Co., supra, but the doctrine enunciated therein is clearly applicable.

But it is to be noted that in the case of State of Iowa v. Chicago, B. & Q. R. Co., supra, the state statute (Laws Iowa 1888, c. 28, § 27) under consideration specifically provided that the penalty was to be "recovered in a *civil action* by ordinary proceedings instituted in the name of the state" (italics supplied). Notwithstanding this terminology the veil of form was lifted to disclose an action for a public wrong.

"A federal court will not treat as removable, and therefore will not take jurisdiction of, a suit brought in a state court to enforce a criminal or quasi criminal state statute, or of a suit brought to recover a penalty under such state statute." City of Montgomery, Alabama v. Postal Telegraph Cable Co. (D.C.) 218 F. 471, 475.

Thus in our cases the fact that the actions are brought by common informers

makes them none the less forms of punishment for public, not private, wrongs. The state of New Jersey created this form of penalty for the violation of her statutes. The courts of the state of New Jersey constitute the forums wherein such actions shall be tried. The actions are not removable to the federal court, and the motions to remand will be granted.